May it please the Court, Stephen G. Sanders on behalf of the Appellant to the United States of America. With the Court's indulgence, I'd like to reserve four minutes of rebuttal. Granted. Thank you. Your Honor, the District Court in this case committed two legal errors. It treated a known 911 caller as anonymous and then it judged the stop on the basis of information that was unknown to the officers who made that stop. The defendant in this case does not try to defend those errors. You subtract those from the reasonable suspicion analysis and the suppression order has to be reserved, reversed, and there has to be a remand for a trial on the felon in possession charge. Move that microphone up a little. I'd be happy to and I'll speak louder. Thank you. Now. Just so we understand, make sure we get the facts. Ms. Daniels called twice within about, I guess, 12 minutes or so. Called twice within an hour. Oh, within an hour. I'm sorry. Less than an hour. And did she give her name in the first call or the second call or both? She gave her name in the second call, her first name. In the first call, I believe she didn't give any identifying information, but the responding officer talked to her and obtained her name and address. Well, she had on the dispatch, there was her phone number and her address. That's correct. So on the first call, Officer McRae showed up. Is that right? That's correct. And then the second call was Officers Feliciano and White. That's correct. And so it's the second call that you're saying we should focus on here? That's correct. I mean, the Officers Feliciano and White did know that there had been a previous call there at that address, but they didn't know what had happened. So they received this call and they responded. And this case turns on two legal questions. First is, did the District Court error in treating Edna Daniels as an anonymous informant? Well, for the first call, probably she was anonymous. If McRae showed up, she wouldn't be anonymous. Because they not only had her That's right. And she knew certainly when she called the second time that the law enforcement officers had that information. So she certainly knew that she could be tracked down in the event her second report turned out to be false. And then in the second call, we know that she gives her name and address, and she's reporting an incident, an emergency situation at the very place she's calling from. So her report is entitled to a presumption of reliability because it's reporting an ongoing emergency. The officers have to respond to and not have time to second-guess corroborating information or question the caller's identity. If your Honors don't have questions about that aspect of this case, I'd like to turn to where I think this case turns on and where I think there was an error committed below, and that is in marshalling the totality of the circumstances here, because there are at least six factors that, when you combine with a call from a known 911 caller, narrow the universe of potential suspects and allow these officers to stop the three males that they saw at 2823 Clinton Street. And these are, the first two are geographic and temporal proximity. Those are the two factors that this court in Goodridge said were the most significant. And here we're doing, we're in a better position than in Goodridge because these suspects were stopped right at the address that the call was reported from and in closer in time. In Goodridge, I think it was at least seven minutes out and several blocks away. Here we have the base of contact by the suspect that was absent in Goodridge. Beyond that, you have an identifying feature that was absent in Goodridge. You have a description of someone in a red hat, and they see someone in a red hat right in front of that address. And then three more factors that are an overlay... Although there were things that were... Pardon? Although there were items that were misidentified where they had... That's correct. But we can't expect 911 callers who are reporting an emergency incident to give encyclopedic descriptions. And then on top of all the officers see and they know, they know there's a report of a gun, they know that guns are transferable, and they know, and this is a fact I didn't stress in my brief, but it's something you can, you know from the fact that Mr. Garfin is sitting in the car, they can't see his hands. They can't see the hands of somebody who is clearly associated with at least the one suspect who matches the description. So what are these officers to do? They have to detain at least the person in the red hat. They have... But I also thought that what they saw was a gun in plain view. Is that correct? Well, that's once they gave the order for Mr. Garfin to get out of the car. Okay. Got it. But they couldn't simply leave Mr. Garfin sitting there while they detained the male in the red hat or his companion who hadn't managed to get in the car, or just detain only the male in the red hat and let these two individuals float around the area in a position to ambush them. The only Goodrich fact you don't have here is this was the afternoon and not the night. That's correct, and I want to say a word about that. That's a factor that's not as important I think in a case where you're acting on a 911 call. In a case where you have officers on the street who are observing conduct that may be innocent, then whether the time of day and whether it's a high crime area becomes much more important. It was important in Goodrich. But in this case, where officers are responding to a 911 call, there's less of a concern whether it's a time of day. And I didn't point out, the males that the officers saw were the only males on the street. This was not a dragnet that was passed by these officers. Well, they were found right in front of the house too, weren't they? That's correct, Your Honor. The Court has no questions. I'll sit down. No, I don't have any. I'm balancing my time. Thank you. Thank you. Ms. Moy. Thank you, Your Honor. If it pleases the Court, Maggie Moy, Assistant Federal Public Defender, on behalf of Mr. Karp Starkey. Respectfully, Your Honor. You move the microphone so that it's good. Does that work? Much better, dear. Your Honor, respectfully, it's our position that the government's appeal in this matter must fail for the following reasons. First and foremost, despite the government's assertion throughout their briefing that there was, that Mr. Karp Starkey and the other man's males quickly moved towards the car. That, in fact, is not true and not supported by the record. When one goes through the record to find when the word quickly was raised at all, it was only raised by the government in its argument to the Court. The problem that I'm having is if I were either Officer Feliciano or Officer White, and I was told by my superior to report there's been a 9-1-1 call, and gave a description and said there were people getting ready to fight, et cetera, and you show up at the house and you see people across the street perhaps quickly getting into a car where you think you perceive it might be. What would you, what are you supposed to do if you're that police officer? Well, I think first we must note that Officer Feliciano's testimony at page 13, 14, and 30 of the transcript is that when he arrived at the scene, as he arrived at the scene, he saw the men simply walking across the street. So that we are, again, importantly, in a quiet residential neighborhood as Officer Feliciano testified when he was asked. Yes, he did, but he said much more than that. And I can get to that as well, Your Honor. Midday, the normal sort of behavior. They showed up how long after the second call? Well, Your Honor, the timing is important in this case. The 9-1-1 call occurred at 1223. Exhibit number 3. No, the first call was 1331. The second one was 1423. That's correct. The first call was approximately an hour earlier. The first 9-1-1 call. That call, as the Court pointed out, clearly was anonymous. And while the officers who responded to the second call, which is what is at issue in this case, were aware of the first call, they were unaware of the resolution of that call. They were unaware whether or not the officers spoke to anyone. But again, if you were that officer and you now know there is a second call about people perhaps getting ready to fight, and what she said, some have guns, is that what she said? No, Your Honor. The call was in terms of the second 9-1-1 call. Several males were outside fighting. Radio dispatch included a description. Okay. All right. So in terms of... Oh, no. Radio dispatch says one wearing a red and black shirt and another wearing a red cap and possessing a firearm. Okay. If you're a police officer, if you don't show up and investigate that and something happens, you are on the front page of the newspaper. I understand that, Your Honor. But however, let's talk about the timing then of the second 9-1-1 call. The time of the 9-1-1 call itself was at 2.23 p.m. The dispatch call did not go out until approximately 2.27 p.m., about four minutes later. I have 2.25, two minutes later. When you look at the bottom part of Exhibit 4... And then they arrived at 2.35, 12 minutes later. You see the dispatcher putting the call out to the officers was at 2.27 p.m. Okay. The arrival of the first officer was at 2.35, which is a full 12 minutes after the initial 9-1-1 call. So my question to you is, okay, you're that officer, either one. What are you supposed to do? You're supposed to, when you arrive at that location as a trained officer, you're going to make observations of what you see. Do you see any illegal or suspicious behavior? You see men who are already in the course of walking across the street, not running, not acting suspiciously, walking normally towards a vehicle that... You've got one guy in a red hat, which is part of the... Which is not Mr. Parsgarthin. One guy in a red hat, three men, walked right in front of the building, and they're the only three men on the block. Well, the call was suspicious persons, several males. There were both three men, and there were two women, that only one person matched the physical... Excuse me. There was no physical description. There was no description as to race or age. But there was one man in a red hat. Correct. Are you suggesting to Judge Ambrose that they were required to keep on going, the officers were required to keep on going? Well, what I'm suggesting to Judge Ambrose and to Your Honor is that when the officers arrived at the scene, they may have had reasonable suspicion as to the individual with the red hat, but at the time that the officers then blocked Mr. Parsgarthin's vehicle in place and withdrew his weapon, at this point they had seen Mr. Parsgarthin neither fit the description, did not engage in any suspicious, evasive, or suspicious behavior, and he had been seized without any reasonable suspicion. The other individuals were not in the car. The man with the red hat was not in the car. They had the opportunity to question the red hat man... They were going to the car. The one man was in the car, the other two were going toward the car, i.e., reasonable to assume, were going to get in the car, particularly when they saw the officers. They had the opportunity. You have two officers there, and as the record developed, there were additional officers responding to the scene. The officers, in terms of stopping the individual, the only individual who fit any description was the person with the red hat. In terms of asking Mr. Parsgarthin to get out of the vehicle, however, had these individuals been walking down the street, they wouldn't have had any ability or justification for stopping Mr. Parsgarthin. Again, so what would you have done when you showed up? Would you have just said, Well, I guess there's nothing here. I'll go talk with Mrs. Daniels and see if anything happened in the last 12 minutes. No. When they arrived at the scene, they certainly had the right to engage with the individual with the red hat. That individual was not in the car. That individual is the only person who fit the description. There were multiple officers arriving at the scene, so there was the ability to both control the scene as well as... But Mr. Sanders pointed out that you just can't leave him in the car like that. I mean, you don't know he could have something on him. It turns out he does. He has a firearm on him. I mean, for your own safety, don't you have to make sure he gets out of the car so you can assess the situation where you're secure? Well, first of all, this is not a car stop. The question is whether there was individualized reasonable suspicion as to Mr. Parsgarthin. There was not. And he was not in the same place as the person for whom... We don't know. There were males getting ready to fight. He could have been one of those males. But again, we don't know that there were males getting ready to fight because there is an issue that we noted in our brief, which is, as I've already indicated to the court, from the time of the initial call until the time the officers arrived on the scene, almost a quarter of an hour passed. Unlike all the other emergent situations that the government raised in their brief, this case is not a case of someone being threatened with a weapon, someone's shots fired, a weapon being branded. First and foremost, there's an allegation that... Well, that would go more to the reliability of the tip. Right. Whether it's an emergent, whether she's reporting something she's seen. But we're not talking about that now. But there's also the timing issue because the second 9-1-1 call, and frankly, as far as I'm aware, both 9-1-1 calls, were apparently either not reported nor preserved. We don't know whether the caller was indicating, in fact, that there are males outside fighting now, whether she saw males fighting, or when she saw the gun. We don't know, and we can't presume or guess. Well, we do know how fast McCrae got there after the first call. He got there right away, within a minute or two. Right, and nobody was there. Well, I know that. But in this case, they did get there right away. Obviously, she was reporting something that was happening. And then she called back. But we can't presume that because an earlier call relates that something had just occurred to these different set of facts. Because we're dealing with the second call. We can't impute Officer McCrae's knowledge to either Officer Feliciano or Officer White. All Officer White and Officer Feliciano know is that there was some prior call. Ms. Moy, can I ask you, what is the standard that we must measure this against? Is it probable cause? Is it reasonable suspicion? What is it? Isn't it reasonable suspicion? It is reasonable suspicion, Your Honor. And it's not reasonable suspicion just to stop the defendants, is it? Yes, it is, Your Honor. It's reasonable suspicion for people like that. Wouldn't it be reasonable suspicion to stop these three people that were obviously together? No, Your Honor. I submit to the court that all the reasonable suspicion cases, specifically both in the 2006 Brown case, Third Circuit case, as well as in Goodrich, they talk about the reasonable suspicion as to the particular suspect being engaged in criminal activity. And that's the crux of this case, because there is no reasonable suspicion as to Mr. McClark. The report here was not of one person. The report was of several persons. So you say that once they could stop one person and found him not to be carrying a weapon, they could not stop the others. That would have to be your argument. They could not search the others. They had no reason, unless they saw something. They couldn't even stop them. In other words, they couldn't tell Carstorphine to get out of the car, right? Correct. The officers had no information about a vehicle. They had no information about Mr. Carstorphine. The only information they had, they had no information as to race. They had no information as to age. They had no information as to any physical characteristics. They had information as to two clothing descriptions. One, an individual with a red hat. Second, an individual with a red and black shirt. There was no person with a red and black shirt on the scene. I read the record to say that that was the same person, but I could be wrong. I think it's a little confused that the guy with the red and black jacket also had the red hat, but that doesn't matter. Well, I think what is clear is, in listening to the transcript, they said an individual with a red hat and red and black shirt. They never indicate whether it's the same or different person. What is clear is the individual with the red hat that the officers observed was not wearing a red and black shirt. There was no one with a red and black shirt. And did not have a gun. And Mr. Kerserfin was all in black. Furthermore, Your Honor, the officers didn't... The allegation is that there was some sort of fight. We don't know whether this was a verbal fight, physical fight. What is clear is when the officers arrived on the scene, they did not see any... They neither heard or saw fighting, obviously, nor did they see any sort of prior fighting having occurred in terms of shortness of breath, disheveled clothing, any signs of injury. This was, again, this is... While it's not akin exactly to J.L., it is similar in that you have simply... You don't have an emergency situation. They did not. The caller did not indicate. They knew McRae had been there a short time before. They went there, and they knew there was a fight because of this dispatch. And the only three men in the area were right in front of the house, where an officer had been less than an hour before, and you've got three men right in front of the house, one wearing a red hat. Well, we don't know whether or not... I'm not sure if the court's impugning anything from the first call. No, no, but they knew McRae had been there. They knew McRae had been there, but they didn't... Wasn't it reasonable for them to assume that he had been there for the same reason that they're now going there? I don't think it's reasonable for them to make that assumption whatsoever. They do know that a woman has called twice within an hour and that there's obviously something going on. They don't know that, Your Honor. They know that there was a previous call. As the court pointed out... They knew there was a previous call, okay. And so something's going on that they need to investigate. That's what they know. And the information specifically they have is that they were looking for some individual with a red hat, somebody with a red and black shirt, and that someone, the person in the red, whether that's the red hat or the shirt, has a weapon, but not that there was any threat being made with the weapon or that the weapon was being brandished. And when they arrive on the scene, they do not see anything suspicious. What they see is... I would go to the issue of whether or not it was a high-crime area, if I may, because I see that I'm drawing close to my time. The district court properly concluded that this was not a high-crime area. The first officer to testify when asked directly by the government as to whether or not, how to characterize the area, said it was quiet for the most part. Wait a minute, wait a minute. That's not what Officer Feliciano testified. That's what he did testify to. Well, one of the officers testified that he thought it was a high-crime area, and the other officer, I thought, testified that while it was quiet for the most part, there were incidents. Right, but we don't have... He said he got a lot of calls for drugs on this day, and then they asked him how many drugs, and he said probably less than 50, and this area was a half a block in proximity to 2823 Quentin, which is the area in question. I don't think the officer, in reading the transcript and having seen him testify, I don't believe that he was indicating that it was 50 arrests on that day or calls for drugs on that day. Oh, no, he didn't say that. He said that it was asked how many arrests you participated in that area, and he said various. I couldn't even state how many. More or less than 50. Answer, less than 50. Your Honor, 1 is less than 50 and 49 is less than 50. The government failed to establish any time frame. Is this 50 arrests in his career, which is 7 years, or is it within 50 arrests within the last 30, 60, even 90 days? There is no evidence in this record for this court to conclude... You think that the record shows this is a very benign area? Yes, I do think the record shows it is a benign area for the lack of clarification by the government and, more importantly, the district court in this case is the finder of fact. The district court had the ability, unlike Valentine, where the issue of whether or not it was a high-crime area was undisputed, uncontradicted. In this case, it is at issue, and there is contradictory evidence from what Officer Feliciano said and what Officer White said. The district court has the best ability to make a determination as to credibility, to evaluate the demeanor, how the witness answered these questions, and the district court in this case made a very reasoned and sound decision as to whether or not this area was a high-crime area and decided it was not, and thus that factor is not met. One question, final question, just to give you... make sure... Obviously, it doesn't appear that we're treating this as an anonymous tip case. I assume that you're not treating this as an anonymous tip case. We're not treating it, and we would disagree with the government. Judge Rodriguez did not treat this as an anonymous tip either. This was... Judge Rodriguez simply went through the analysis, the normal analysis in comparing it to a known informant, to a face-to-face encounter, and went through that analysis. In retrospect, he might have opined as to whether he thought she was anonymous or not, but the court did not base its reasoning on that. The court made its reasoning based on the content of the tip in terms of vagueness with no race, no age, no physical description. Thank you. Thank you, Your Honor. Mr. Sands. Your Honor, I'd like to clear up the issue regarding the timing. My adversary said that it was 15 minutes from the time the dispatch went out to the time that Officer Feliciano responded. That's true only if you focus on the calls for detail report, which is at page A67 of the record, but the testimony of Officer Feliciano was that he was two blocks away and responded within 60 to 90 seconds of receiving the dispatch. That's a four-minute swing from the time the call came in to the time he responded. So we have a temporal proximity that's better than in Goodrich and all the other cases that we have on this issue. On the issue of the report, it says the male's fighting. The caller states she saw the weapon. We know that's a violent incident in progress that threatens to escalate into even more violent ones. It's an ongoing emergency, and the officers treated it as such. The issue is whether they were reasonable in doing so. Protective detention. That's my last point. My adversary says that while the officers may have had reasonable suspicion to detain the person in the red hat, they couldn't do anything with respect to Mr. Kostarpin because he was already in the vehicle. But he got into the vehicle because he saw the officers and managed to be the first one to get in, unlike the other two. There are two cases, Baker v. Monroe, I cited in my brief, and U.S. v. Maddox out of the Tenth Circuit that said you have reasonable suspicion to detain someone to protect the officers, even if you don't have suspicion that they may have engaged in the crime. Now, we believe Mr. Kostarpin, there was suspicion that he was a suspect, but even if he posed a threat to the officers at that time, they had reasonable basis to detain him briefly. And that's what they did. We ask that you reverse the order. Thank you. I'm just a little bit of an inside comment. I'm delighted there were only three 28-J letters in this case. We will take this very well-argued case under advisement. And we're going to take a five-minute break.